# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NEXTGEN HEALTHCARE | : | CIVIL ACTION |
| INFORMATION SYSTEMS, INC., | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| JAMES MESSIER, | : | |
| Defendant. | : | NO.  05-cv-5230 |

## MEMORANDUM AND ORDER

November 10, 2005

Pratter, District Judge

     Nextgen Healthcare Information Systems, Inc. ("NextGen") seeks issuance of a

temporary restraining order and preliminary injunction pursuant to Federal Rule of Civil

Procedure 65 against its former employee, James Messier, to prevent Mr. Messier's violation of

the terms of a non-competition, non-solicitation and non-disclosure agreement entered into as

part of an employment contract between them.  NextGen's motion was filed on October 5, 2005

(Docket No. 2)[1], and notice of the motion was immediately provided to the Defendant by way of

a telephone conference among all counsel and the Court for the purpose of agreeing upon a

prompt hearing date.  By agreement, the hearing in this matter commenced on October 11, 2005

("N.T. I"), continued on October 12 and 28 ("N.T. II"), and concluded on November 3,

2005 ("N.T. III").  While the proceedings were technically characterized as considering the

application for the temporary restraining order, inasmuch as the proceedings followed notice and,

occurred over the course of an entire calendar month, they certainly were not as expedited as

---

[1]This case was commenced by the filing of a verified complaint in the Court of Common
Pleas for Montgomery County, Pennsylvania.  Defendant Messier removed the case to this Court
on October 4, 2005.

would be typical for an application for a TRO.  In reality, this matter has already proceeded more in the nature of a preliminary injunction hearing even though the parties and the Court have continued to consider the matter immediately at hand as involving only the TRO application. After thoroughly reviewing the evidence presented and the applicable law, the Court makes the following findings of fact and conclusions of law and grants Plaintiff's application for a temporary restraining order, grants the parties' motions for expedited discovery (Docket Nos. 3 and 4) and sets this case for further proceedings to commence on December 21, 2005, all as included in the accompanying Order.

I.     **FACTS**

NextGen is a California corporation with its principal place of business in Horsham, Montgomery County, Pennsylvania.  It is a wholly-owned subsidiary of Quality Systems, Inc. ("QSI") and previously did business under the name Micromed.  N.T. II at 4-5.  NextGen develops, markets and sells electronic medical record ("EMR") and practice management systems to the medical community.  An EMR system consists of software that electronically records and stores all of the medical information that practitioners traditionally retained in hard copy form in a patient's file.  A practice management system is software that handles the financial aspects of a medical practice, including billing, scheduling and reporting.  N.T. I at 4. NextGen has been in this business since approximately 1994, N.T. III at 107, and contends that it has developed a unique and proprietary EMR system using its development team, its knowledge base experts and its other experts in individual medical specialties.  N.T. I at 4-5.  NextGen sells to all medical specialties, but its primary markets are in the cardiology, ophthalmology, orthopedics and family practices.  N.T. I at 5.  With 32 installations ("sales") in the last fiscal year, NextGen's ophthalmology market line is one of its two largest.  Pl. Ex. 22.

Defendant James Messier and his family reside in Massachusetts.  Having attended various post-high school courses, including classes in computer science, and after a stint at construction work, Mr. Messier began a career in the medical and diagnostic devices, equipment and ancillary materials industry, most particularly in the ophthalmology field.  He worked for a number of different companies.  Mr. Messier's initial jobs related to field repairs of equipment, and then running regional service offices.  He eventually moved into sales and marketing by the later 1980's.  N.T. III at 6-8.

By the early 1990's, Mr. Messier had become affiliated with a German company that was engaged in the distribution in North America of ophthalmology-specific EMR software.  N.T. III at 10-13.  Soon thereafter, Mr. Messier became a co-founder of a spin-off enterprise, IFA Systems, Inc., serving as its president starting in January 1994.  N.T. III at 13.  IFA's business was the development and sale of EMR software for ophthalmology practices in the United States and Canada.  IFA also pursued opportunities for interfacing its EMR systems with practice management systems of other vendors.  N.T. III at 14.  IFA actively marketed its product, including sponsoring workshops and seminars, advertising, attending trade shows, preparing trainers, developing leads and collecting data concerning potential customers.  N.T. III at 14-21.

NextGen (operating under a different corporate name) was also active in the EMR marketplace for ophthalmology practices at the same time, as were other vendors.  N.T. III at 14.  At its Zenith, IFA had about $1.2 million in sales and approximately 45 EMR customers, but Mr. Messier never realized his $100,000 annual salary in any year of IFA's existence.  N.T. III at 15, 26, 93-94.  By the spring of 2002, with Mr. Messier having invested his own funds in an effort to keep the company viable, IFA ran out of financing, and the situation was "growing worse and worse and worse on a month-by-month basis" so that Mr. Messier sought ways out of his

business problems.  N.T. III at 28.  His immediate options were either to put IFA into bankruptcy or to try to sell off assets and dissolve the company.  N.T. III at 28-29.  He ultimately chose the latter course and personally assumed various of the company's liabilities.  N.T. III at 28-30.

With this background, and having been unsuccessful in interesting NextGen in purchasing IFA assets, Mr. Messier was interested when he was contacted by NextGen about possible employment "[b]ecause [he] had no job and no money."  N.T. III at 33-34.

Sometime before September 27, 2002, Mr. Messier had spoken with Pat Cline, NextGen's President, about a job opportunity with NextGen.  Pl. Ex. 7; Pl. Ex. 21 ¶ 2; N.T. III at 70.  In a letter to Pat Cline dated September 27, 2002, Mr. Messier thanked Mr. Cline for previously discussing the job opportunity, said that he was planning to come to NextGen's office to visit Mr. Cline and "the team" to consummate an employment agreement on October 18, 2002, and asked Mr. Cline to send him by e-mail or mail an outline of the terms they had discussed so that Mr. Messier could reflect on the proposed terms and discuss them with his wife.  Pl. Ex. 7; N.T. I at 129; III at 71-73.

On October 16, 2002 Mr. Cline e-mailed Mr. Messier (with a copy to NextGen's Ike Ellison) an offer letter with an outline of terms as Mr. Messier had requested in his September 27, 2002 letter.  Pl. Ex. 1.  In that letter, among other things, Mr. Cline wrote: "As you probably expect, we would also have you execute an employment agreement with non-disclosure, non-compete and non-solicitation language."  Pl. Ex. 1; Ex. 21 ¶ 3.  At the hearing Mr. Messier professed never to have seen the October 16 letter and initially testified that the e-mail address to which Mr. Cline sent the October 16 offer letter was inactive at that time.  However, other documentary evidence which Mr. Messier did not similarly question persuades the Court that the e-mail address at issue was in use by Mr. Messier at and about the time of the Cline

communication.  Moreover, Mr. Messier never attempted to contact Mr. Cline to say he had not received the outline of terms requested in Mr. Messier's September 27 letter.  N.T. III at 82.

On October 16 or 17, 2002 Mr. Messier called Ike Ellison, the NextGen manager to whom he would be directly reporting, and, according to Mr. Ellison, said that he had received Mr. Cline's October 16 letter and was accepting the NextGen employment offer.  N.T. I at 8.  Mr. Messier did not refute this testimony by Mr. Ellison.

As anticipated in his September 27 letter, Mr. Messier visited NextGen on October 18, 2002, at its Horsham, Pennsylvania headquarters to "consummate an employment agreement" and to complete some new related paperwork.  N.T. I at 77.  Mr. Messier began work and was added to NextGen's payroll as of October 21, 2002.  N.T. I at 85-86; Pl. Ex. 50.  During the week of October 21, 2002, Mr. Messier helped represent NextGen at the American Academy of Ophthalmology's ("AAO") national conference and trade show in Orlando, Florida.  Pl. Ex. 51; N.T. I at 9; N.T. III at 40.  While at the conference on October 22, Mr. Messier sent an e-mail to Mr. Ellison from the same e-mail address to which Mr. Cline had sent the October 16 offer letter and stated that "about 110 contacts" had been made in the first two days of the AAO conference, that he was busy making industry contacts for interfaces and that he was trying to learn the "program."  Mr. Messier also wrote that he wanted to visit NextGen's offices again the following week "to get things going."  Pl. Ex. 51; N.T. III at 74-78.

While Mr. Messier was at the AAO conference in Orlando, NextGen sent him a standard Employee Confidential Information Agreement.  N.T. I at 87-88; Pl. Ex. 28.  Mr. Messier signed that agreement on October 23, 2002.  Pl. Ex. 5.  By mistake, the version of the Standard form of agreement that Mr. Messier signed on October 23 did not include the non-competition provision that Mr. Cline had referenced in his e-mail letter of October 16, 2002 to Mr. Messier.  N.T. II at

7.  The October 23 agreement did, however, include customer non-solicitation and confidentiality provisions.  Pl. Ex. 5.

Mr. Messier visited NextGen's offices in Horsham the following week and was in the office on October 29, 2002.  On that day, Bob Ellis, NextGen's Executive Vice President of Operations and Legal, reviewed Mr. Messier's employment papers and realized that Mr. Messier had been presented with the wrong agreement which he signed on October 23.  N.T. II at 7.  Mr. Ellis personally spoke with Mr. Messier and told him that he had executed the wrong form of agreement, that he (Mr. Ellis) would get the correct non-competition language from Mr. Cline and would immediately provide a new, corrected agreement to Mr. Messier.  N.T. II at 10-11, 46. He then did so, and presented the revised agreement to Mr. Messier that day.  Mr. Messier reviewed and signed the agreement in Mr. Ellis' presence on October 29, eight days after he started work for NextGen.  N.T. II at 15.  The October 29 agreement contained the non-competition provision that Mr. Cline had told Mr. Messier about in the October 16 e-mail before Mr. Messier had accepted NextGen's offer of employment and before he ever started work for NextGen.  Pl. Ex. 4.[2]

The Court concludes that Mr. Messier had notice before he began working at NextGen that he would be required to execute a non-competition, non-solicitation and confidentiality agreement as a condition of his employment.  Pl. Ex. 1.

---

[2]To satisfy a request by QSI's payroll department, Mr. Messier also received a standard form offer letter that added standard employment information (including his start date) that Mr. Cline had not included in the October 16 offer letter.  Although this subsequent offer letter bears a date of October 18, 2002, according to a NextGen personnel department witness, this additional standard form letter actually was not prepared until October 30, the date on which Mr. Messier counter-signed it while he was still in Horsham.  N.T. I at 95-96; Pl. Ex. 6.  By the time that Mr. Messier received the October 18 standard employment offer letter, he had already accepted employment with NextGen pursuant to Mr. Cline's October 16 offer and had signed the October 29 agreement.  N.T. I at 108.

The terms of the October 29 agreement purport to prohibit Mr. Messier, for one year following the voluntary termination of his employment, from indirectly or directly engaging as an employee or owner in the business of developing, marketing or selling products or services of the type developed, marketed or sold by NextGen[3] while Mr. Messier was employed by NextGen in the geographic area in which it does business, namely throughout the United States. The terms of the October 29 agreement (as do the terms of the October 23 agreement form) also prohibit Mr. Messier from indirectly or directly calling on or soliciting Next Gen's customers and potential customers for one year after his voluntary termination. The October 29 agreement (like the October 23 agreement) further prohibits Mr. Messier from using or disclosing NextGen's confidential information and trade secrets at any time. Pl. Exs. 4 and 5. Both the October 29 and October 23 forms of agreements include provisions prohibiting an employee such as Mr. Messier from having any other employment or other similar status or activity while also employed by NextGen that conflicts with the employee's obligations to NextGen. Pl. Exs. 4 and 5.

As described above, in his September 27, 2002 letter to Mr. Cline, Mr. Messier anticipated an "aggressive compensation package." Pl. Ex. 7. When he started at NextGen in 2002, Mr. Messier was paid an annual salary of $120,000 with potential for a 40% bonus based on achievement of certain objectives, for a total annual compensation package of $168,000, plus benefits. Pl. Ex. 1; N.T. III at 95. Subsequently, Mr. Messier's compensation package also included commissions for sales. Thus, by working at NextGen in 2004, Mr. Messier earned approximately $210,000. N.T. III at 95-97.

Mr. Messier was aware that NextGen hired him because of his expertise and contacts in

---

[3]NextGen has limited its focus to enforce the agreement only insofar as it prohibits competition with NextGen's ophthalmology business in which Mr. Messier worked while employed at NextGen. See Verified Complaint at 10; N.T. III at 175.

the industry, and he acknowledges that he was well compensated as a result.  N.T. III at 111, 113.

For his part, Mr. Messier needed to be in a business that could provide him with the support that

IFA Systems no longer could in addition to providing personal financial stability.  N.T. III at 103-

05.  He considered NextGen to be a "different kind of company" that could and did provide that

desired support.  NextGen's involvement with practice management systems, which IFA had not

sold, also created additional cash flow to support an EMR business and gave Mr. Messier the

opportunity to sell EMR systems as a "value add" for practice management customers.  N.T. III

at 107-08.  These features made NextGen an attractive opportunity for Mr. Messier.

      Once he was hired by NextGen, Mr. Messier became NextGen's Vice President and

Ophthalmology Product Manager.  Pl. Ex. 6.  As such, Mr. Messier was responsible for

expanding NextGen's ophthalmology business.  His work involved obtaining input from

customers to improve the NextGen ophthalmology product, developing content to make the

ophthalmology product more competitive, working with NextGen's marketing team to develop

brochures and marketing materials for ophthalmology, selling the ophthalmology product to

customers, and developing device interfaces to connect the product with the ophthalmology

equipment used in ophthalmology practices.  In addition, Mr. Messier worked with device

manufacturers to develop strategic partnerships for NextGen.  N.T. I at 10.

      After joining NextGen, Mr. Messier set about learning about NextGen's business models,

its products and personnel, goals and strategics.  Senior NextGen personnel describe Mr. Messier

as becoming an expert on the inner workings of NextGen's ophthalmology products.  With

NextGen's template editor, a software tool that NextGen taught him how to use, Mr. Messier

spent eight to ten months developing the content of the ophthalmology-specific templates.  N.T.

III at 57; 117-18.

As befitting a vice president of project management, Mr. Messier visited ophthalmology practices around the country with NextGen's sales representatives and helped demonstrate and sell the NextGen ophthalmology product.  N.T. I at 13; III at 50-54.  He also went to customer sites to collaborate with customers to improve the product, to install interfaces, to implement the product, and to train customers in its use.  Id.  Mr. Messier also had frequent customer contact via "Webex demos" which are web-based demonstrations in which a NextGen representative sitting in his office could demonstrate the product over the Internet to prospective customers anywhere in the country.  N.T. III at 53-54.  Mr. Messier also used Webex to perform client support services, such as developing and reviewing templates and installing interfaces.  N.T. I at 21.

In December 2003 and January 2005 Mr. Messier accompanied NextGen's sales representative, Terry Chamberlain, to the Wolfe Clinic, a large ophthalmology practice headquartered in Marshalltown, Iowa.  N.T. I at 132; Pl. Ex. 24 ¶¶ 12, 13, 14.  Jerry Shultz, NextGen's Vice President of Sales, previously had called on and submitted a proposal to the Wolfe Clinic.  In addition, Mr. Messier and Ms. Chamberlain conducted a telephone conference with Wolfe Clinic's technology head in February 2004.  Pl. Ex. 24 ¶¶ 12, 13, 14.  Thus, the Wolfe Clinic was a bona fide potential customer of NextGen and Mr. Messier was aware of NextGen's efforts to sell its EMR system to Wolfe.

To develop NextGen's ophthalmology product's content, Mr. Messier worked with NextGen's knowledge base development team.[4]  He worked with the development team to develop interfaces for ophthalmology devices.  He worked with NextGen's marketing department

_____

[4]The knowledge base is a specialty-specific suite of templates used by clinicians to document patient care on a computer.  N.T. I at 14-15.

to develop strategies and programs to market the product.  N.T. I at 14-15.  Thus, NextGen

provided resources to Mr. Messier to assist him to develop the product (through the template

editor and the knowledge base development team), in marketing the product (through the

marketing department), and in selling the product (through the marketing department and sales

representatives).

NextGen publically promoted Mr. Messier in the ophthalmology industry and

substantially assisted him, using its assets and name, in obtaining, or at least expanding, a

prominent reputation and extensive contacts in that industry.  For example, NextGen sent Mr.

Messier to trade shows where, as would be expected in this industry, he met many prospective

customers and made presentations at NextGen's expense and using its name.  N.T. II at 134; III at

101-03, 126-127; Pl. Ex. 51.  Also, as would be typical, Mr. Messier worked with NextGen's

marketing department to develop a multi-page brochure targeting the ophthalmology industry and

promoting Mr. Messier and his capabilities.  N.T. II at 23; III at 119.

During his NextGen employment, Mr. Messier had access to confidential information

about NextGen's business and products, including the product specifications, how the product

operates, how it was developed and what its strengths and weaknesses are.  N.T. I at 23; III at

117-18.  Similarly, he had access to confidential information about NextGen's customers and

potential customers.  N.T. I at 23.  In fact, one of Mr. Messier's first projects for NextGen was to

review every customer contract and related documents for ophthalmology customers.  N.T. III at

115-16.  NextGen uses a research team to analyze customer prospects and identify medical

practices to target for marketing purposes.  N.T. II at 23.  Some of the information generated by

the marketing department is not publicly available.  N.T. II at 24.  NextGen's customer and

prospect information is maintained in a database called "Goldmine" that is available to

employees on a need-to-know basis. Goldmine contains detailed information about customers and prospects, the identity of the lead contact and decision-maker, the prospects' concerns and needs, their buying cycle, their budget for the product, and competitors that are being considered. N.T. II at 21; N.T. I at 25. The parties disagree as to whether or to what extent some of this information was publicly available or if Mr. Messier had access to information maintained on Goldmine either online or by receiving hard copies of the material from the marketing department and others who gathered the information, but no evidence was presented to persuade the Court that if he did have access to the "Goldmine" information he ever did or did not use it.

Mr. Messier also had access to NextGen's confidential information about its actual or prospective strategic partners and vendors and was responsible for developing and/or managing some of these relationships. N.T. I at 23. While working for NextGen, Mr. Messier learned and helped its confidential business strategies for the ophthalmology field, including how it planned to grow its business through product development and strategic relationships with vendors. N.T. I at 23-24. Mr. Messier also had access to NextGen's confidential pricing practices. N.T. I at 30. Although it was suggested during the hearing that prices or pricing information were made public at trade show demonstrations called "shoot-outs" or "bake-offs", it appeared that the price information disclosed at such events was general in nature and that actual pricing is subject to variables that were not taken into account at these demonstrations. N.T. II at 141, 145; III at 134-36.

NextGen endeavors to take various precautions to preserve its confidential business information and/or protect its competition position in its industry. For example, NextGen employees sign confidentiality agreements. N.T. II at 18. NextGen's employee handbook is intended to address the need to maintain the confidentiality of company information. N.T. II at

18.  Each NextGen employee has a security card for access to the company's building.  N.T. II at

18.  NextGen has computer servers that are secured by lock and key, and some are secured by

biometric keys.  N.T. II at 18.  The company's computer system has a unique login for users and

requires a password.  N.T. II at 18.  NextGen's contracts with customers, vendors and resellers

contain confidentiality provisions, and NextGen requires the execution of a non-disclosure

agreement before it enters into discussions with third parties about business matters.  N.T. II at

18-19.  NextGen has refused requests to provide its customers with a list of attendees at its

annual user group meeting.  N.T. II at 20.

Mr. Messier's employment relationship with NextGen appears to have been entirely

satisfactory to all concerned, and Mr. Messier was not looking to leave NextGen.  N.T. III at 58.

However, in June of 2005 after discussing potential employment opportunities with Medflow for

several weeks, Mr. Messier accepted employment with Medflow in late July or early August

2005 to become Vice President of Sales and Marketing.  N.T. II at 88; III at 59-60.  Medflow

competes directly with NextGen in the ophthalmology EMR field.  N.T. I at 27; III at 120, 123;

Pl. Exs. 53, 55, 56.  For example, Medflow and NextGen are competing directly for the Wolfe

Clinic's business.  N.T. I at 156; Pl. Ex. 16.  Mr. Messier first met Medflow representatives,

including its CEO and General Counsel Thad Throneburg, at an industry trade show to which

NextGen sent Mr. Messier and at which he made a presentation.  N.T. II at 81-82.  Mr. Messier

had also met representatives of Meflow when NextGen competed with Medflow for prospective

business in 2004.  N.T. III at 125; Pl. Ex. 56.  Mr. Throneburg wanted to hire Mr. Messier

because Mr. Messier had a "great reputation in the industry," N.T. II at 85, and he had extensive

contacts in the ophthalmology industry.  N.T. II at 105-06.  He wanted to hire Mr. Messier

because he thought that Mr. Messier would be able to sell a lot of product.  N.T. II at 137.

Medflow hoped that hiring Mr. Messier would increase its profile and visibility in the industry. N.T. II at 134.  Mr. Throneburg told vendors, such as Zeiss, that Mr. Messier was coming to Medflow.  N.T. II at 111.

On August 30, 2005, Mr. Messier called Mr. Ellison at NextGen and told him he was resigning from NextGen.  N.T. III at 60.  He then sent Mr. Ellison a letter on September 1 to confirm the resignation to be effective September 15.  Pl. Ex. 2.  Mr. Ellison attempted to talk Mr. Messier into remaining at NextGen, but Mr. Messier told Mr. Ellison that he had received an ownership stake in another company, wanted to return to entrepreneurial endeavors and was going to pursue that opportunity.  N.T. I at 26.

On September 9, 2005, and again on September 14, 2005 while still employed at NextGen, Mr. Messier sent an e-mail to NextGen's customers telling them that he had resigned from NextGen, that he was staying in the ophthalmology field and that he was going to work for Medflow.  He invited the e-mail recipients to come by to say hello to him at the upcoming AAO conference.  Pl. Ex. 54.

While still employed by NextGen, Mr. Messier went onto Medflow's payroll effective September 1, 2005 and received pay from both Medflow and NextGen from September 1 through September 15, 2005.  Pl. Ex. 23 at 7; N.T. I at 139.  While Mr. Messier was still employed by NextGen, on or about September 7, 2005, Mr. Throneburg notified Mr. Messier that Medflow had approved Mr. Messier's receipt of a two percent (2%) ownership interest in Medflow.  Pl. Ex. 23 at 17; N.T. I at 153.

Furthermore, while still employed by NextGen, Mr. Messier communicated with Meflow about arrangements for an upcoming trip to the Wolfe Clinic that he was to make with other Medflow employees.  N.T. I at 50-51; Pl. Ex. 23 at 13.  Medflow notified the Wolfe Clinic on

September 14 that Mr. Messier had become a Medflow employee.  N.T. II at 125; Pl. Ex. 23 at

15.  During this same time period, Mr. Messier attempted to refer Dr. Darwin Lao, a NextGen

customer, to Medflow.  N.T. I at 33-35; Pl. Ex. 23 at 1; Pl. Ex. 54.  He also worked with

Medflow on arrangements for Medflow's booth and presentation at the upcoming October 2005

AAO trade show where NextGen would also be actively pursuing potential customers.  N.T. I at

144, 149-50; Pl. Ex. 23 at 9, 13.  While Mr. Messier was still employed by NextGen, Medflow

sent him a computer, a complete version of Medflow's software and Medflow's VPN log-on

information so that Mr. Messier could connect directly to Medflow's exchange server.  Pl. Ex. 23

at 7; N.T. I at 138-139.  As an example of that communication, and while still employed by

NextGen, Mr. Messier communicated with Medflow personnel about strategies on interface

devices.  N.T. I at 144; Pl. Ex. 23 at 9.

   Before Mr. Messier left NextGen, Mr. Messier communicated in writing with Medflow

about prospective business with Carl Zeiss, a device supplier.  N.T. I at 136, 148-49; Pl. Ex. 23 at

9.  Mr. Messier also communicated directly with Carl Zeiss about a cooperative relationship with

Medflow and about meeting with Zeiss's sales force.  N.T. I at 136-37.  Mr. Messier's

communications about Zeiss were intended to strengthen the bond between Medflow and Zeiss.

N.T. I at 145.  As known to Mr. Messier, Mr. Zeiss and another device supplier, Marco, do

business with NextGen.  N.T. I at 149.

   In late September 2005 soon after leaving NextGen, Mr. Messier traveled to Iowa on

behalf of Medflow to meet with doctors and administrators at the Wolfe Clinic.  N.T. II at 89;

N.T. I at 131.  Mr. Messier's explanations of the purpose of his trip to the Wolfe Clinic and his

role during that trip varied throughout the hearing in this matter.  See N.T. I at 64, 130-131, II at

126.  However, before Mr. Messier went to work for Medflow, Medflow had never had a face-to-

face meeting with the Wolfe Clinic, although it had been attempting to do business with Wolfe Clinic since 2003.  Def. Ex. 23; N.T. II at 123.  In September 2205, when Medflow was making arrangements for Mr. Messier to visit Wolfe Clinic on its behalf (and while Mr. Messier was still employed by NextGen) Mr. Throneburg knew that Medflow was competing directly with NextGen for Wolfe Clinic business.  Pl. Ex. 16.

Some of the critical issues in this dispute can only be resolved by accepting the testimony of one witness over another.  In this case, much depends upon the credibility of Mr. Messier. Even after allowing for normal forgetfulness, innocently clouded perceptions, nervousness or the like, in too many instances did Mr. Messier's memory seem to fail him on points critical to his position only to be crystal clear on issues to his advantage, or vice versa, seemingly depending upon the perception of what was helpful to his defense or not.  His record-keeping skills appeared, at best, spotty, so that he questioned the efficacy of the October 29 employment contract ostensibly because he had no copy of it in his files and did not remember signing it. However, he testified that his files had not included a copy of his own September 27, 2002 letter or the October 23 agreement either.  He professed to have forgotten about those documents as well.  In no instance, however, did he disavow the signatures on those documents as his own.

There were other instances in Mr. Messier's testimony that undermined his credibility - - some venial, others more serious.  Questions about Mr. Messier's representations about his educational background at the hearing and the resume he submitted to NextGen in 2002 may perhaps be characterized as unfortunate puffery.  Pl. Ex. 61; N.T. III at 89-93.  However, Mr. Messier's testimonial shifting on other issues was more problematic.  For example, in his initial testimony, Mr. Messier attempted to disavow his September 27, 2002 letter to Mr. Cline.  Pl. Ex. 7, by saying that he did not remember it and that it was addressed to the wrong company

(Micromed).  N.T. I at 129.  He would admit only that the signature on the letter appeared to be a copy of his own.  Id.  Once it later appeared that the company name was correct, N.T. II at 4-5, Mr. Messier then admitted that he wrote the letter and claimed that he was able to remember the circumstances surrounding its creation.  N.T. III at 68-69.

Another example arose concerning Mr. Messier's October 2002 e-mail address and the effort to throw doubt on the October 16 offer letter, a document that everyone in the case realizes is of critical importance.  He initially testified that he had dissolved IFA in July 2002 and that the IFA e-mail address used by Mr. Cline for transmitting the October 16, 2002 offer letter was not in service at the time of the letter.  N.T. I at 130.  He claimed that he was using a different e-mail address to communicate with NextGen, admitting only that he "may have" used the IFA e-mail address at some point.  Id.  Later, however, NextGen introduced e-mails it received from Mr. Messier from the IFA e-mail address, both before and after October 16, 2002, including one that Mr. Messier sent on October 22, 2002.  Pl. Exs. 51, 52.  Once this evidence was brought forward, Mr. Messier admitted that he was using the IFA e-mail address in the time frame of the October 16 offer letter.  N.T. III at 87.

Before his last day at NextGen, Mr. Messier attempted to delete from his NextGen laptop computer all information relating to his Yahoo e-mail account and to Medflow.  N.T., Offer of Proof,  I. at 161.  Although this was attempted only one month before his testimony in this litigation, Mr. Messier claimed not to remember doing it.  N.T. I at 146-47.

By all accounts, Mr. Messier is a talented and successful EMR salesman and marketer. Those are not his only marketable skills, however.  Mr. Messier has a number of skills that are generally valuable in sales and marketing positions, including the ability to maximize sales volume, the ability to sell high-end software solutions.  He has experience negotiating complex

deals, and experience reaching customers' top decision-makers.  N.T. III at 97-98.  Before he became involved with EMR software, Mr. Messier had extensive experience and expertise in selling specialized equipment, including diagnostic equipment and other hardware used by ophthalmology practices.  N.T. III at 100-01.  He has great familiarity with the ophthalmology industry in the United States and extensive contacts in that industry.  N.T. III at 144.  By his own account, Mr. Messier has considerable knowledge of the interface device industry and close relationships with numerous manufacturers of ophthalmic devices.  N.T. III at 114-15.  Thus, Mr. Messier would be qualified for several types of jobs that would not require direct competition with NextGen's ophthalmology product line.  For example, he would be qualified to sell ophthalmic hardware for companies like Marco or Zeiss or to consult with large ophthalmology practices or hospitals regarding the implementation of EMR systems.  N.T. III at 130, 143.  He could use his contacts in the ophthalmology industry to sell pharmaceuticals in that specialty, or he could master another specialty and sell EMR products in that specialty.  N.T. III at 143, 145-46.

Mr. Messier has extensive confidential information about NextGen's product, its development, and its strengths and weaknesses.  N.T. II at 30.  Therefore, Mr. Messier is in a position to advise Medflow about how to improve its product to meet the strengths of NextGen's product and to exploit the perceived weaknesses of NextGen's product.  He can use his inside knowledge in making comparisons for prospective customers.  N.T. I at 30-31.  Likewise, Mr. Messier has access to NextGen's confidential pricing policies and could advise Medflow on how to price its products in comparison to NextGen.  N.T. I at 30.

NextGen did invest resources in Mr. Messier and compensated him so that he could become successful and even better known in the EMR industry for ophthalmology practices.

N.T. II at 29-30.  Mr. Messier developed substantial goodwill with NextGen's customers and prospective customers in the ophthalmology industry as a result of NextGen's investment in and support of his activities.  N.T. III at 137.  NextGen had endeavored to restrict its competitors' possible exploitation of Mr. Messier's skill sets by meeting Mr. Messier's interest in an "aggressive" compensation package when he was hired in 2002.  Now, Mr. Messier's employment with a direct competitor of NextGen has damaged, and will continue to damage, NextGen's goodwill with those customers and prospects.  By the same token, Mr. Messier is depriving NextGen of the fruits of its investment in that goodwill by attempting to exploit it to benefit one of NextGen's competitors.

## II.    CONCLUSIONS OF LAW

### A.    Legal Standards

Rule 65 of the Federal Rules of Civil Procedure authorizes the Court to issue temporary restraining orders and preliminary injunctions.  In deciding whether to grant injunctive relief as NextGen seeks, the Court must consider whether (1) NextGen has demonstrated the likelihood of its success on the merits; (2) NextGen will be irreparably harmed by the denial of injunctive relief; (3) the balance of the harms favors NextGen or if, instead, granting the relief would result in even greater harm to Mr. Messier; and (4) the public interest favors granting the injunction. Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3rd Cir. 2004); ACLU of New Jersey v. Black Horse Pike Reg. Bd. of Ed., 84 F.3d 1471, 1477 (3rd Cir. 1996); see also Siemens Med. Solutions Health Servs. Group v. Carnelengo, 167 F.Supp. 2d 752, 757 (E.D. Pa. 2001) (applying same standards in non-compete case).  Given that this is at the instant stage a motion for a temporary restraining order, NextGen is not required to prove its case in full now, but needs only to demonstrate a likelihood of success on the merits.  It is important for these parties to

acknowledge that the purpose of a temporary restraining order is to preserve the status quo pending either a business solution to their dispute or a preliminary injunction hearing and a trial on the merits.

**B.    Likelihood Of Success On The Merits**

There is no dispute that Pennsylvania law controls the substantive legal issues in this case.  Under Pennsylvania law, restrictive covenants are disfavored but are enforceable if: (1) they are ancillary to an employment relationship between the parties; (2) if they are supported by adequate consideration; (3) the restrictions imposed by the covenant are reasonably necessary for the protection of legitimate interests of the employer; and (4) the restrictions imposed are reasonably limited in duration and geographic extent.  Hess v. Gebhard & Co., 570 Pa. 148, 157, 808 A.2d 912, 917 (2002); Thermo-Guard, Inc. v. Cochran, 408 Pa. Super. 54, 64-66, 596 A.2d 188, 193-94 (1991).

As the challenger to the enforcement of a non-competition covenant, Mr. Messier bears the burden of proving that the terms of the non-compete and other restrictions are not supported by consideration and/or are unreasonable.  John G. Bryant Co. V. Slling Testing & Repair, Inc., 369 A.2d 1164, 1169-70 (Pa. 1977).

Before he accepted employment with NextGen, Mr. Messier received notice that he would be required to execute non-compete, non-solicitation and confidentiality restrictions as a condition of his employment with NextGen.  He was understandably anxious to secure employment and financial security with NextGen and sought an outline of the proposed terms of a job offer to discuss with his wife in advance of solidifying the relationship in person.  The October 16, 2002 letter was clear notice that restrictive provisions would be required.

Given that Mr. Messier received this notice, his execution of the October 29 agreement

within eight days after he began work rendered the covenants it contained ancillary to his

employment, and thus supported by adequate consideration, as a matter of Pennsylvania law.

National Business Services, Inc. v. Wright, supra at 707-08 (E.D. Pa. 1998) (holding that a

restrictive covenant signed ten days after the beginning of employment was ancillary where, as

here, the employee had notice of the restrictive covenant before accepting employment).  No

additional consideration was necessary.  Id.  See also cases cited therein, 2 F.Supp. 2d at 707.

   To the extent that Mr. Messier argues the earlier October 23 agreement as precluding

enforcement of the October 29 non-compete agreement, the evidence presented supports the

conclusion that the October 23 agreement mistakenly omitted the non-compete restriction, which

both parties knew was to be executed, and was reformed to reflect their true intent by Mr.

Messier's execution of the October 29 agreement.[5]  See Evans v. Marks, 218 A.2d 802, 804-06

(Pa. 1966); Blanchfield v. Commonwealth, 513 A.2d 1156, 1157 (Pa. Cmwlth. Ct. 1986); see

also Restatement (Second) of Contracts § 155, cmt.b.

   Mr. Messier has the burden of showing that the non-compete and non-solicitation

restrictions in this case as NextGen seeks to enforce them - that is, with respect to its

ophthalmology product line - are unreasonable in scope.  John G. Bryant Co. V. Sling Testing &

Repair, Inc., 471 Pa. 1, 369 A.2d 1164, 1169 (Pa. 1977).  Stated differently, the restrictive

provisions will be enforced only to the extent they are no broader than necessary to protect the

legitimate business interests of NextGen.  At this juncture, Mr. Messier has not met this burden.

The confidentiality provision, which is not subject to a reasonableness test, also is enforceable.

---

[5]Mr. Messier challenged the authenticity of the October 29 agreement and protested that
the copy initially introduced during the hearing was not countersigned by NextGen.  NextGen
later produced the original agreement bearing the original signatures of Mr. Messier and an agent
of the NextGen parent company, QSI.  Pl. Ex. 63.

In Pennsylvania, trade secrets, confidential information, customer goodwill and specialized training and skills are among the business interests entitled to protection through restrictive covenants.  National Business Services, 2 F.Supp. 2d at 708; Hess, 808 A.2d at 917. All of these protectible interests are involved here.  In fact, National Business Services provides a persuasive analysis for evaluating this case.  In National Business Services, the court's description of the defendant employee's role within the plaintiff company's operations is close to an apt description of Mr. Messier's role at NextGen:

> Wright had wide-ranging contact with [NBS'] customers and potential customers over a significant period of time.  Wright . . . became an industry spokesperson on Internet products while at [NBS].  Wright had access to confidential information regarding [NBS'] customers, products, technical details, and marketing strategies, both present and future.
>
> Wrights' proposed work for Impact would violate the noncompete agreement.  If Wright were to work as Vice-President of Internet Services for Impact, she would be marketing and developing Impact products in direct competition with the [NBS] products she marketed, and she would be selling to the exact same customers that she dealt with at [NBS].  It is virtually inconceivable that Wright would be able to avoid utilizing the confidential information she learned at [NBS] and exploiting [NBS'] customer goodwill.  Even if Wright did not have direct contact with customers, Impact could publicize its employment of Wright in order to capitalize on [NBS'] goodwill.

National Business Services, 2 F.Supp. 2d at 708.  In this case, the Court continues to have concerns as expressed on the final day of the hearing that the restrictions here will cover hundreds, if not thousands, of potential EMR users that neither NextGen nor Medflow could ever hope to sell their systems to and, hence, may have an unreasonable impact.  Because NextGen's counsel's observations of the difficulty in preserving the identity of NextGen's "best prospects" from among the thousands of potential customers bears consideration, and because the Court intends to revisit promptly this issue at the preliminary injunction stage, no finding of unreasonableness is necessary at this time.  Suffice it to say, this issue is analytically open to

further consideration when the Court again addresses these issues at the preliminary and/or permanent injunction stage.

The temporal and geographic scope of Mr. Messier's non-compete is reasonable. One-year restrictive covenants are routinely enforced under Pennsylvania law, and Mr. Messier's non-compete contains a geographic limitation that matches the geographic areas where NextGen does business according to the evidence presented. Nationwide non-compete restrictions are enforceable under Pennsylvania law where the former employer does business on a nationwide scale. National Business Services, 2 F.Supp. 2d at 708.

Comparing the provisions in the employment agreement with the conduct described at the hearings, NextGen has met its immediate obligation to demonstrate the likelihood of proving that Mr. Messier has violated his agreement by: (a) working for Medflow, a direct competitor of NextGen in its ophthalmology product line; (b) agreeing to take an ownership interest in Medflow: (c) soliciting and calling on NextGen's customers and prospective customers on behalf of Medflow; and (d) using or being in a position inevitably to use NextGen's confidential information to benefit himself and Medflow.

### C.    Irreparable Harm To NextGen

NextGen has established that it is likely to succeed on the merits of its claims against Mr. Messier. Preservation of the status quo while the parties prepare to litigate NextGen's possible entitlement to further injunctive relief will protect NextGen from irreparable harm, including (a) damage to its customer relationships and customer goodwill; (b) the exploitation of its goodwill to benefit Mr. Messier and Medflow; (c) the use of its confidential information and trade secrets to damage its competitive position and to benefit Mr. Messier and Medflow; and (d) having to compete against the significant investment that it made in Mr. Messier and that it contracted to

protect for one year.  See National Business Services, 2 F.Supp. 2d at 709 (injury to goodwill and

use of confidential information constitute irreparable harm); Hillard v. Medtronic, Inc., 910

F.Supp. 173, (M.D. Pa. 1995) (preserving customer relationships and goodwill is a protectible

interest; restrictive covenants provide employer with "breathing spell" in which to regain

customer goodwill after loss of employee).

**D.     Risk Of Harm To Defendant And The Public Interest**

Mr. Messier will suffer less harm if temporary injunctive relief is granted than NextGen

will suffer if it is not granted.  If such relief is not granted, NextGen will suffer the

aforementioned irreparable harm and will lose the benefit of its bargain with Mr. Messier.  There

is an important public interest in enforcing contracts voluntarily entered, particularly those

entered by knowledgeable and experienced businessmen such as Mr. Messier.  See Merrill

Lynch, Pierce, Fenner & Smith, Inc. V. Napolitano, 85 F.Supp. 2d 491, 498-99 (E.D. Pa. 2000).

The requested injunctive relief only restrains unlawful conduct by Mr. Messier and preserves the

status quo that existed before he began it.  See Gerardi v. Pelullo, 16 F.3d 1363, 1373 (3rd Cir.

1994) (injunction prohibiting employee from disclosing trade secrets "properly restores the

parties to their status as it existed immediately prior to the allegedly wrongful conduct").

Mr. Messier's current position with Medflow may be his preferred match for his personal

goals and skills.  However, under the circumstances presented here, Mr. Messier was not

"hoodwinked" or exploited by NextGen.  He certainly could have more fully updated his

personal files, or more completely acquainted himself with his employment documentation to

better appreciate the extent of his contractual undertakings with NextGen before pursuing his

opportunities with Medflow.  Under the circumstances, since he at least was able to tell Mr.

Throneberg that he was under a confidentiality obligation, at a minimum, given the paucity of

materials in his files and his incomplete recollections, Mr. Messier should have endeavored to

ascertain the actual provisions of his obligations.  Mr. Messier simply is not entitled to his "ideal

job."  National Business Services, 2 F.Supp. 2d at 709.  He is entitled to earn a living, id., and his

experience and expertise in the EMR and ophthalmology industries make him qualified for many

other jobs or consulting engagements. Moreover, the Court has set a course for as short a time as

possible between the entry of the TRO and the next phase of this case so that should Mr. Messier

later prevail he will have been restrained for only a brief time.

**III.    CONCLUSION**

Pending a hearing on NextGen's motion for a preliminary injunction, Mr. Messier will be

temporarily enjoined in accordance with the accompanying Order.

BY THE COURT:

/S/_____
GENE E.K. PRATTER
*United States District Judge*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

NEXTGEN HEALTHCARE                :        CIVIL ACTION
INFORMATION SYSTEMS, INC.,        :
                Plaintiff,        :
                           :
        vs.        :
                           :
JAMES MESSIER,                    :
            Defendant.        :        NO.  05-cv-5230

**O R D E R**

AND NOW, this 10th day of November, 2005, pending a hearing on Plaintiff's motion for

a preliminary injunction,

1.      Defendant James Messier is temporarily enjoined from:

      a.      Directly or indirectly engaging, as an employee, owner or in any other

capacity, in any sales, financing, staffing, strategic planning, marketing,

product design or any other activity of any business, including but not

limited to Medflow, that is in competition with Plaintiff NextGen

Healthcare Information Systems, Inc.'s ophthalmology business, but he

need not at this time as a result of this Order resign from Medflow;

      b.      Directly or indirectly performing services for, calling on, soliciting or

catering to any individuals or entities who were customers or potential

customers of NextGen's ophthalmology business within one year

preceding his resignation from NextGen; and

      c.      Directly or indirectly using or disclosing any of NextGen's trade secrets or

confidential or proprietary business information for any purpose

whatsoever;

2.      NextGen shall file a bond issued by a commercial bonding company in the

amount of Two Hundred Thousand Dollars ($200,000.00);

3       The parties' motions for expedited discovery (Docket Nos. 3 and 4) are

**GRANTED**;

4.      A final pretrial conference will be held on Thursday, December 15, 2005 at 2:00

p.m. in the Court's Chambers, and a hearing on NextGen's motion for a

preliminary injunction and such other further proceedings as may be appropriate

will be held on December 21, 2005, at 10:00 a.m. in a courtroom to be

determined.

BY THE COURT

/S/_____
GENE E.K. PRATTER
*United States District Judge*